Filed 4/4/14  P. v. Lancaster CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B242207 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA117910) |
| v. | |
| MICHAEL LANCASTER et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of Los Angeles County. Arthur M. Lew, Judge.  Affirmed with directions.

Janyce Keiko Imata Blair, under appointment by the Court of Appeal, for Defendant and Appellant Michael Lancaster.

Robert L.S. Angres, under appointment by the Court of Appeal, for Defendant and Appellant Bryan Jammahl James.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr., and Stephanie A. Miyoshi, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendant Michael Lancaster of second degree murder (Pen. Code, § 187, subd. (a))[1] (count 1) and willful, deliberate, and premeditated attempted murder (§§ 664/187, subd. (a)) (count 4). The jury found with respect to both counts that the crimes were committed for the benefit of, at the direction of, and in association with a criminal street gang (§ 186.22, subd. (b)(1)).

The jury convicted defendant Bryan James of first degree murder (§ 187, subd. (a)) (count 1) and three counts of attempted murder (§§ 664/187, subd. (a)) (counts 2, 3 & 4). The jury found that the attempted murder in count 4 was willful, deliberate, and premeditated. The jury found that in the commission of all counts, James personally and intentionally discharged a firearm causing death or great bodily injury, that he personally and intentionally discharged a firearm, and that he personally used a firearm. (§ 12022.53, subds. (b), (c ) & (d).) The jury also found that the crimes were committed for the benefit of, at the direction of, and in association with a criminal street gang. (§ 186.22, subd. (b)(1).)

The trial court sentenced Lancaster to 15 years to life for the murder in count 1 and a consecutive sentence of life with a minimum term of 15 years in count 4. The trial court sentenced James to 180 years to life and a consecutive determinate sentence of 56 years. In count 1, James received 75 years to life (25 years to life doubled to 50 years to life as a second strike, plus 25 years to life for the firearm allegation). In count 2, the trial court imposed 18 years (nine years doubled as a second strike), 10 years for the gang allegation, and 25 years to life for the firearm allegation. In count 3, the court imposed 18 years (nine years doubled as a second strike), 10 years for the gang allegation, and 25 years to life for the firearm allegation. In count 4, James received 30 years to life (15 years to life doubled), plus 25 years to life for the firearm allegation.

Lancaster and James appeal on the grounds that: (1) the trial court denied their state and federal constitutional right to trial by jury and created a structural defect in the

---

[1]    All further references to statutes are to the Penal Code unless stated otherwise.

proceedings requiring reversal when it exceeded its authority by reopening jury selection after the trial jury was sworn; (2) their rights to a unanimous 12-person verdict under the California Constitution was violated because all 12 jurors did not appear in court to affirm the verdicts, which rendered the verdicts invalid.

James additionally appeals on the grounds that: (1) Lancaster's jailhouse statements to his cellmate constituted inadmissible hearsay as to James, and the statements should not have been admitted into evidence against him; and (2) the abstract of judgment must be modified to reflect the oral pronouncement of judgment.

Both James and Lancaster join in all arguments raised by each other to the extent the argument may accrue to his benefit.

## FACTS

### I. Prosecution Evidence

#### A. The Shooting

On the evening of December 7, 2008, Stephanie Smith drove her car to the home where her son, Dedric Wallace, was staying with his girlfriend. Wallace was a member of the 94th Street Hoover gang with the moniker Kool Aid. In the front passenger seat was Smith's 13-year-old daughter, Shatera Simpson, and in the rear, behind Smith, sat her stepdaughter, Breyanna Chase Simpson. Wallace's girlfriend, Gretrece Fields, lived near the intersection of 102nd Street and Denver Street in Los Angeles. Wallace and Fields came out to the car, and Fields stood and spoke with Smith on the driver's side of the car. A champagne-colored car drove by and almost struck Fields.

Wallace asked Smith to take him to a gas station so that he could buy a snack. Wallace sat in the rear seat behind Shatera. On the way to the gas station, Breyanna noticed a car flashing its high beams behind them. After Wallace made his purchases, Smith began driving him back to his girlfriend's. Shatera noticed a car with bright lights was following them very closely. Upon arriving at Fields's home, Smith pulled over to park. She said, "Don't turn around, it may be the police."

At that point, the car behind them pulled up alongside Smith's car and "they started shooting." Breyanna looked over and saw a gun. Shatera heard nine or 10

3

gunshots.  Wallace, who had been getting out of the car, ducked.  Wallace was not injured.

Smith died from multiple gunshot wounds.  She suffered four wounds, one of which was fatal.  One projectile was recovered from Smith's body.

Breyanna fell over onto the car seat and "blacked out," although she could still hear.  She heard Shatera screaming.  Breyanna was struck by bullets in the jaw and right leg.  She was not able to speak for a month due to the wound to her jaw.  The left side of her body was partially paralyzed for two or three months.

Shatera was hit three times.  She suffered wounds in her arm, elbow, and thigh.  The bullet that hit her arm traveled through her stomach and pierced her lung, causing it to collapse.

Police found 10 cartridge casings in the area near the shooting.  All of the cartridge casings were "9-millimeter Luger caliber designation."  Nine of the cartridge casings were fired from the same firearm.  The tenth was of a different manufacture and tests proved inconclusive as to whether it was from the same weapon.  It was "not in great shape."  There was nothing to indicate that it was fired from a different weapon either.[2]

Three fired bullets and two bullet jacket fragments were collected from Smith's vehicle.  Microscopic comparison showed that four of the items were fired from the same gun.  It could not be determined whether the smallest jacket fragment was fired from the same weapon.  A bullet retrieved from Smith's body and collected by the coroner was fired from the same firearm as the other bullets.

A bullet path analysis showed that the paths of the bullets hitting the car were consistent with the victims' vehicle being stationary and the suspect's vehicle driving alongside the victims' vehicle while someone in the suspect's vehicle fired rounds from a

---

[2]     Breyanna told police there were two shooters wearing ski masks.  Shatera also believed that there may have been two shooters.

semiautomatic weapon. One gun from the suspect's car could produce the bullet pathways in Smith's car.

On December 8, 2008, in the early morning hours after the shooting, Los Angeles Police Detective Gerardo Pantoja interviewed Wallace at Harbor UCLA Medical Center. Wallace described the suspect's vehicle as a 1990-era, champagne-colored, Nissan Maxima with tinted windows.[3] Wallace said he saw three to four male Blacks in the vehicle. At 10:35 a.m. on that day, Wallace telephoned Detective Pantoja and said the car was not a Maxima but rather an Infinity that looks like an Altima. He said it was champagne-colored or beige. Detective Pantoja testified that the lights in the area of the shooting were "milky yellow white lights." These lights often distort the color of a car. At some point, Detective Pantoja showed Wallace a photograph of an Infiniti J30 that he had downloaded from the Internet. It was of a color similar to the one described by witnesses. Wallace stated that the photograph depicted the vehicle involved in the shooting and was also the vehicle that "banged on him two days before the shooting on 102nd and Figueroa."

On December 22, 2008, Detective Pantoja and Detective Tingirides again interviewed Wallace. The interview was audio recorded, and portions were played for the jury. Wallace said that when his mother was driving him to the gas station, a car was driving close to Smith's vehicle and then it turned. When they were returning from the gas station, a car ran a red light and drove up behind them and caught up to them. The car put on the high beams. Wallace and his family thought it was the police. As Smith was pulling over to the curb to let Wallace out, all he heard was gunshots. Wallace heard the windows break at approximately the fifth shot, and he heard his sister screaming. Wallace said he hopped out of the car and ran around to stop his mother's car because it had begun to roll. Wallace was sure it was one gun that fired. He could tell by the way it

---

[3] Breyanna described the car as a dark, four-door vehicle.

sounded. Wallace thought he heard someone say, "Lanes," but was not sure if it was just something in his head. The suspect's car did not drive off quickly.

Detective Pantoja showed Wallace a photographic lineup in which Eric Pious, who was known as Big E-Mack, was the focus. As the detective extracted the lineup from his notebook, Wallace pointed to Pious's photograph and said, "That's him, that's him." He said that Pious was the person he saw drive by and say "Denver Lanes" while he made a gang sign from a car on December 5, 2008. It was the same car he saw drive off when his mother was killed, and the shots came from that car. Wallace did not indicate that Pious was involved in the shooting of his mother on December 7.[4]

### B. Investigation Leading to Identification of the Perpetrators

#### 1. Lancaster's Recorded Statements in Custody

On September 2, 2009, Los Angeles Police Detective Nathan Kouri arranged to have Lancaster placed in a cell with Kerry Smith, a fellow Denver Lanes gang member, at the Los Angeles County Jail. Detective Kouri was conducting a homicide investigation in which Kerry[5] was the focus. Kerry was known as Baby Bat Mite and was in state prison at the time. Timothy Booten was known as Big Bat Mite. The conversations in the cell that Kerry and Lancaster shared were recorded. Detective Kouri listened to the recording and gleaned that the two were talking about the homicide at 102nd Street and Denver Street. He gave the information to one of the investigators in the Smith homicide.

---

[4] Wallace was an uncooperative witness at trial. He testified that he did not recall speaking with police on two occasions, and he denied making the statements he made to the detectives. He did not know where the shooting was coming from because he was ducking. When asked what a snitch was, he replied, "I don't know. You tell me." He denied being a member of the 94th Street Hoover Criminals gang, and he did not know who the gang's enemies were. He denied signing the photographic lineup and writing on it.

[5] We refer to Kerry by his first name, since his last name is the same as that of the murder victim.

The prosecutor played three audio files from the three-hour recording. The conversation was riddled with gang jargon, which had to be interpreted by Detective Samuel Marullo, who testified as a gang expert. During the conversation, Lancaster stated, "On Lanes, when we go to the boos on DLB I take Little E-Mack on Lanes Big E-Mack, Bat Mite, on Lanes, and Shady all in Bat Bar they all in this Blood on Lanes they go on 102nd . . . ." Lancaster continued, "Boolaid from Boova out there." And, "I was all ready, Little E-Mack, I was gonna do it on Lanes but the homies already wanted Little E-Mack . . . on Lanes they give Blood the burner this nigga want Lady Menlo to drive Blood on Lanes I'm like hell no Blood on Lanes get in the bar Blood . . . go over there on Lanes do our stuff . . . ." Lancaster told Kerry that someone visited him in Wayside and brought a picture of E-Mack and asked him if he knew E-Mack. Lancaster denied knowing Eric Pious (E-Mack) and Timothy Booten (Bat Mite).

Detective Marullo explained that "on Lanes" meant that Lancaster was "putting it on the gang as a kid or even an adult [would] say I put that on my mom, I put that on everything I love, I put that on God." Detective Marullo said that "Bat Mite" was Timothy Booten. "Bat Bar" referred to Bat Mite's car. "Shady" referred to Brandon Scott. First letters with a "k" sound (as in Crips) are replaced by the letter "b" as a way of showing disrespect from the Bloods. The "H" in "Hoover" was also replaced by a "b" as a show of disrespect. "Bool Aid" was a disrespectful way of referring to Kool Aid, who was Wallace.

Lancaster later told Kerry that "the nigga Boolaid from Boova" was sitting in the back seat behind the passenger. "It's his Blood mama and his sister in the passenger seat he about jump on out of there." Lancaster said he was telling "Little E give me the burner[6] Blood, give me the burner Blood" over and over. Little E said, "I got it this mine." "Blood mama pull up behind a bar like she was parking. Fucked up on Lanes pull up right beside her stop boom Blood light the bar up . . . this nigga shooting on Lanes

---

**6**      A burner is a gun.

he's sparking the bar up on Lanes all you hear is screaming and shit on Lanes don't even get Blood. Killed Blood's mama she got hit in the neck . . . and Blood's two sisters get hit." Wallace "didn't get grazed or nothing." Based on this conversation, Detective Marullo was of the opinion that Lancaster was driving the car from which the shots came. Part of this opinion was based on the amount of detail revealed in the conversation. Lancaster complained that Boolaid was "going around telling everybody that Lil E-Mack is the one that did it on Lanes."

In a discussion about tattoos, Lancaster told Kerry that Little E-Mack acquired a tattoo of a name beginning with an "H" and did not want it "whacked out." Kerry confirmed that this was said by Little E-Mack. Lancaster said "that's brazy."[7] Lancaster informed Kerry that Big E-Mack had changed Lancaster's name to "KG." He indicated that this meant he was "little Killa Gum from Denver Lanes."

### 2. *Testimony of Therowna Davenport*

Therowna Davenport testified that she was Lancaster's girlfriend and had a child with him. She began dating Lancaster when she was 17. Before that, since the age of 13 or 14, she had been the girlfriend of Eric Pious. In 2007 she was interviewed twice by Los Angeles Police Sergeant Andrew Moody because she was a potential witness in one of his cases. In her September 2007 interview she told Sergeant Moody that Bryan James was associated with the moniker Little E-Mack. She said that someone named Charles James, who was actually Charles Fulton, was known as Tiny E-Mack and that Eric Pious was known as E-Mack.

In an October 2007 interview, Moody showed Davenport a photograph of James, and she confirmed that this was the person she had referred to as Little E-Mack. Davenport identified other photographs of gang members, and Moody documented the

---

**7** James has a tattoo reading "Hangout III" with the dates "11-28-86 – 5-31-08." The "H" in "Hangout" was not crossed out. Derrick Chambers, a Denver Lanes gang member also known as Baby Hangout, was killed on May 31, 2008. "Hangout III" referred to Baby Hangout.

8

identifications from both interviews in reports in 2007. James was not a suspect in Moody's 2007 investigation, and he was not trying to "create a persona for somebody named Bryan James as Little E-Mack."

At trial, Davenport testified that she knew Lancaster belonged to Denver Lane Bloods and had the moniker Baby Ru. Davenport also knew Eric Pious and knew that his moniker was E-Mack. She knew James as Little E-Mack and had never heard him called "B" or "Little B." She did not know Pious to use the moniker Lil E-Mack, Baby E-Mack, or Tiny E-Mack.

At the time of a May 7, 2009 interview with Detectives Tingirides and Pantoja, Davenport drove an Infiniti I30 that her grandmother owned. She would lend the car to Lancaster. It was "goldish, tannish" in color.

### 3. *Probation Officer's Testimony*

In 2006, Deputy Probation Officer Harold Johnson was assigned to oversee James, who was on juvenile probation. At one point, Johnson wrote a report on James that was submitted to the court. The report had attachments regarding James's grades, attendance, and "some gang-related taggings that were confiscated from a notebook that he had." Detective Marullo discussed the graffiti and explained its association with the Denver Lane Bloods. One notation was "E-Mack 2," which was a reference to Little E-Mack.

### 4. *Shoe Store Incident*

On November 19, 2008, Los Angeles Police Officer Chris Marsden was investigating a crime that occurred at Warehouse Shoe Sale in Los Angeles. Other officers brought two men to the station and told Officer Marsden what had occurred. The men were James and Trayvonnie Odom. Odom had a cast on his arm. The records showed that James's date of birth was April 9, 1989. Detective Marsden showed James a photographic lineup, and James identified Charles Fulton. James agreed to telephone Fulton, whom he called Tiny E-Mack, to try to convince him to turn himself in or at least speak with Officer Marsden. Shortly after the telephone call, James and Odom were released.

The shoe store incident was discussed by Lancaster and Kerry in Lancaster's recorded statements. At one point, Kerry asked Lancaster about Lil Braze. Lancaster said he was "up in here somewhere" in "Supermax." Lancaster told Kerry that Lil Braze was arrested with two others, one of whom was Lil E-Mack, who "bailed out right then and there." Kerry stated that "Tiny and them get caught in a store and Blood called Tiny from the police station like man come turn yourself in and some more shit." Lancaster later said that "Little E got DPed for that little shit when they went to the little shoe place whatever."[8] "Bone" was "supposed to get DPed too, but he had the cast on."

An investigation by Detective Pantoja into the shoe store incident showed that Charles Fulton, Antoine Pruitt, and James were arrested on May 12, 2009. The records showed that James arrived at a custodial facility on May 12, 2009, and was released on May 13, 2009. The records showed that Pruitt was booked on May 12, 2009, and was released on November 5, 2009. Charles Fulton was booked on May 12, 2009, and was released on September 4, 2009. Detective Pantoja obtained a bail receipt for James. It showed that bail was posted on May 13, 2009.

### 5. Detective Flaherty's Information

On December 10, 2008, Detectives Pantoja and Tingirides met with Detective Patrick Flaherty, who was an expert on the Denver Lanes gang. Flaherty knew James as a Denver Lanes gang member with the monikers Little B and Little E-Mack. Flaherty had never heard of any other Denver Lanes member being referred to as Little E-Mack. Eric Pious was always known as E-Mack. Flaherty stated that gang members sometimes gave one moniker to the police but used a different moniker "within the hood." Flaherty was also familiar with Lancaster as a member of the Denver Lane Bloods.

### 6. James's Cell Phone and Facebook Accounts

On May 17, 2011, Detective Flaherty arrested James in Denver Lane territory. James had a cell phone in his possession. The phone was kept with James's property

---

[8]    "DP" signifies "discipline."

when he was booked. Detective Pantoja retrieved James's cell phone around August 2, 2011. Detective Pantoja arranged for a forensics report on the contents of the phone and the phone number.

In relation to the Smith shooting, Detective Kouri wrote a search warrant for a Facebook account with the user name E.S.O. James. In response to the search warrant, Kouri received an e-mail with a lengthy attachment regarding that Facebook account. Kouri turned over the information to the detectives handling this case.

Among the messages on the Facebook page by E.S.O. James, there were numerous messages advising people to call or text the telephone number that belonged to the cell phone taken from James when he was booked. On May 6, 2011, E.S.O. James wrote a message on Facebook that stated that he was "Lil E-Mack."

On April 9, 2011, James's birthday, the Facebook account contained a number of messages wishing the account holder a happy birthday. Numerous photographs posted on the Facebook account depicted James. One photograph depicted Calvin Cannon, known as Baby E-Mack, James, and a female. The caption read, "Deuce, Three, and Lady E we just missing Tyne and Big." Detective Marullo testified that "Deuce" referred to the number two, and James, as Lil E-Mack, was number two in the E-Mack lineage. Calvin Cannon was number three. Charles Fulton (Tiny E-Mack) and Eric Pious (Big E-Mack) were not in the photograph.

Another Facebook photograph showed James and Cannon and was captioned "Da 2nd and 3rd." One photograph depicted James and Cannon with other people. A comment about that photograph by someone with the user name Queensha Gotti stated, "Aww me fave bros Emack 1&3 ann the Braze nd Moe'ster ilyall." E.S.O. James responded, "Emack 1 not even in that." Queensha Gotti replied, "Ma fone touuch skreen ment to putt 2 LOL SDFU damn u know I lovee yuuu fasho fasho." Another Facebook photograph showed James and was titled "My BFF Lil Emack Ima kill hm 4 dis tatt its cute but Ima kill him but ilma BFF."

11

## C.  Gang Evidence

In his testimony as a gang expert, Detective Marullo stated he was familiar with the Denver Lane Bloods, and the gang had more than 200 members.  The primary activities of the gang included murders, attempted murders, shootings, possessing handguns, selling narcotics, and robberies.  The gang claimed territory bordered by 105th Street, Vermont, the 110 freeway, and 120th Street.  Lancaster was a member of the Denver Lane Bloods with the monikers Baby Ru Blood and KG.  Lancaster had a tattoo between his eyes with the letters "K" and "G."  KG stands for "Killa Gum." The word "gum" was a disrespectful way of referring to a Broadway Gangsta gang member. Lancaster had numerous tattoos testifying to his membership in the Denver Lane Bloods.

Marullo testified that James was a member of the Denver Lane Bloods and had the monikers Little B and Little E-Mack.  Marullo was not aware of anyone other than James being known as Lil E-Mack.  James had tattoos attesting to his membership in the Denver Lanes gang.  The December 7, 2008 shootings occurred in Hoover territory.  Wallace was a member of the Hoover gang with the moniker Kool Aid.  Wallace had several Hoover gang tattoos on his body.

Detective Marullo stated that if someone in a gang took undeserved credit for a mission, he would be disciplined, and the false statements would also be "an obstacle to gang members' aspirations, and that is to be respected in the gang and respected as a gangster."  A gang member who said someone was a shooter when that person was not would suffer the same consequences.

In response to a hypothetical matching the facts of this case, Detective Marullo stated that he was of the opinion that the Smith shooting was done for the benefit of, at the direction of, and in association with a criminal street gang.  He said it was a "classic gang drive-up shooting."  The crimes were done in association with a criminal street gang, since two members of the Denver Lane Bloods committed the crimes together.  The crimes were done at the direction of the gang because the tape-recorded conversation showed that the "big homies actually wanted one of the two Denver Lane Blood gang members to do the shooting."  The crimes benefitted the Denver Lane Bloods because it

12

was "an attempt to eliminate an enemy gang member." The shooting also served as a deterrent because it showed that the gang would "shoot up your whole family to get at you and to get at the Hoovers." The crimes would also bring respect to the gang.

Detective Marullo testified that the crimes would uplift the status of an individual gang member. The driver in the hypothetical could claim this mission as well as the shooter. The driver went "boldly into the enemy's neighborhood so that the passenger in this hypothetical could shoot and kill."

## II. Defense Evidence

### A. James's Evidence

James presented evidence that, on a number of occasions between December 8, 2005, and August 26, 2010, Los Angeles police officers filled out field interview or identification cards after having contact with James. James told the officers that his nickname was Little B, B, or YB. One card showed that James told an officer on January 16, 2006, that his nickname was "either Little B or Face." On September 17, 2009, James told an officer that his moniker was Young Blood. James admitted that he was a member of the Denver Lane Bloods, and he was sometimes contacted along with other gang members. James said he was born on April 9, 1989.

On December 16, 2009, the date of James's arrest in the instant case, two field interview cards were filled out, and both stated that James' moniker was Lil E-Mack.

### B. Lancaster's Evidence

Lancaster testified in his own behalf. He became a member of the Denver Lanes when he was around 14 or 15 years old, along with his twin brother. Lancaster admitted that he went by the names Killa Gum and Baby Ru. To Lancaster, Detective Marullo is "a crooked dude." The detective once spoke to Lancaster about his brother getting a life sentence and said, "You next." Lancaster said that Marullo was "lying about a lot of stuff" and Lancaster believed Marullo was trying to get him sentenced to life. Lancaster said he regretted getting the gang tattoos, but he did it to "fit in." He was "through with gang banging" because it "messed up" his life, his mother was getting old, and he had not yet touched his son, who was almost three years old.

13

Lancaster said that, when speaking with Kerry, he was bragging about something he did not do. He was not the driver and was not involved in the shooting. Lancaster knew that James was not involved in the shooting either. Lancaster said that killing someone's mother was "taking gang banging to a whole other stand" and that he was "not with that at all" because it was "not right."

Lancaster heard about the shooting before he was in custody, and "people talk in county jail." He bragged about the shooting so no one would "mess" with him. Timothy Booten, or Bat Mite, also told him about the shooting.

Lancaster did not know James to be Lil E-Mack. James is Little B, YB, or Young Blood. The person Lancaster knew as Lil E-Mack had stolen from the Denver Lanes and they did not want him around anymore. Lancaster believed James did not want to take on that name because of that.

## III. Prosecution Rebuttal Evidence

On January 23, 2007, Los Angeles Police Officer Tim Pearce and his partner filled out a field identification card for James. James said he was Little B from Denver Lanes. When Detective Pantoja talked to Detective Flaherty on December 10, 2008, Flaherty said that James' moniker was Lil E-Mack. At that time, Detective Pantoja had no reason to believe that, nine months later, Lancaster would be in a cell stating that he was the driver and Lil E-Mack was the shooter. Detective Pantoja told Lancaster that a mother and her daughters had been shot, but did not specify where on their bodies they had been shot. He did not mention where Boolaid was seated in the car. Detective Pantoja downloaded information from the telephone that was booked as James's property at the county jail. There were a lot of photographs of James on the phone.

### DISCUSSION

## I.  Admission of Declarations Against Interest (James, joined by Lancaster)

### A.  *James's Argument*

James contends that none of Lancaster's statements to a fellow inmate and gang member, Kerry Smith, fell within the hearsay exception for a declaration against interest, and therefore all of this evidence was admitted in error. James asserts that the error was

14

prejudicial and extended beyond a state law violation by infringing upon his federal constitutional rights to due process and a fair trial.

### B. *Relevant Authority*

"'Evidence Code section 1230 provides that the out-of-court declaration of an unavailable witness may be admitted for its truth if the statement, when made, was against the declarant's penal interest. The proponent of such evidence must show "that the declarant is unavailable, that the declaration was against the declarant's penal interest, and that the declaration was sufficiently reliable to warrant admission despite its hearsay character."' [Citation.] 'The focus of the declaration against interest exception to the hearsay rule is the basic trustworthiness of the declaration. [Citations.] In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.' [Citation.] '[E]ven when a hearsay statement runs generally against the declarant's penal interest and redaction has excised exculpatory portions, the statement may, in light of circumstances, lack sufficient indicia of trustworthiness to qualify for admission. . . . [¶] . . . We have recognized that, in this context, assessing trustworthiness "'requires the court to apply to the peculiar facts of the individual case a broad and deep acquaintance with the ways human beings actually conduct themselves in the circumstances material under the exception.'"' [Citation.]" (*People v. Geier* (2007) 41 Cal.4th 555, 584, disapproved on another ground in *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305.)

"In order for a statement to qualify as a declaration against penal interest the statement must be genuinely and specifically inculpatory of the declarant; this provides the 'particularized guarantee of trustworthiness' or 'indicia of reliability' that permits its admission in evidence without the constitutional requirement of cross-examination." (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 329.) A reviewing court may overturn the trial court's trustworthiness finding only if there was an abuse of discretion. (*People v. Cudjo* (1993) 6 Cal.4th 585, 607.)

15

## C. *Proceedings Below*

James's attorney, Richard Klink, filed a severance motion in which he argued that Lancaster's statements would violate James's confrontation rights because they were testimonial and constituted unreliable hearsay. The prosecution opposed the motion. At a hearing on the motion in January 2012, the prosecutor argued that the statements were admissible under the declaration against penal interest, and they were made under circumstances that ensured reliability. The court found that the statements were not testimonial, that they constituted a declaration against interest, and that they were reliable. The court denied the motion to sever. The court ruled that the statement was admissible against both defendants.

At a proceeding in April 2012, the parties again discussed the jail cell conversation between Lancaster and Kerry in the context of what portions of the three-hour conversation would be used at trial. The trial court asked the prosecutor and Mr. Klink to precisely lay out what was being sought to be admitted and the objections.

At the next proceeding, Mr. Klink argued that the entire three-hour conversation between Lancaster and Kerry Smith was hearsay except for the portion that the court had already ruled on as admissible, which consisted of Lancaster telling Kerry Smith about the shooting in which Smith was killed. There were three more excerpts of the recording that the prosecution wished to have admitted. Mr. Sanabria, Lancaster's counsel, also objected, stating that the other portions were not relevant and were overly prejudicial, since they included discussions about other crimes. The prosecutor argued that the other portions were admissible under the rule of completeness in Evidence Code section 356.[9] The additional excerpts explained and provided context for the already admitted excerpt

---

[9] Evidence Code section 356 provides: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence."

16

in that they revealed the person to whom Lancaster was referring when he spoke about Lil E-Mack. Mr. Klink insisted that Lancaster was not present at the events he spoke about, leading to double hearsay. The prosecutor stated that he was bringing independent evidence of the incidents. With the excerpts, the prosecutor sought only to show Lancaster's understanding of "who is who," specifically, who Lil E-Mack was.

The court stated that its tentative ruling was that the disputed excerpts were hearsay. At argument on the following day, both defense counsel specified their specific objections to certain portions of the recording. The prosecutor explained line by line the portions of the recording he wished to use, as well as their meaning, since the language used by Lancaster and Kerry was obtuse gang jargon. The prosecutor also answered questions by the trial court regarding the hearsay or nonhearsay nature of the excerpts in question. After hearing further argument from Mr. Klink, the trial court ruled that it would admit all four excerpts, or audio files, requested by the prosecution.

Prior to the audio files being heard by the jury, Mr. Klink again objected to certain portions of audio files one, two, and three on the basis of hearsay. The trial court overruled the objections. The prosecutor played the audio recordings during his direct examination of Detective Marullo, who explained what he heard on the recordings.

### D. Statements Properly Admitted

According to James, neither Lancaster nor Kerry had any reason to believe Lancaster's statements would be used against him because they did not know their cell was bugged. James also notes that Detective Marullo stated that the shooting would actually enhance Lancaster's position in the gang rather than place him in a negative light. Therefore, Lancaster's statements do not constitute declarations against interest. James adds that, even if this Court should conclude that Lancaster's statements were contrary to his social or penal interest, they still constituted inadmissible hearsay because they were not inherently trustworthy. This is because, although Lancaster admitted that he drove the car while James carried out the shooting, Lancaster also tried to distance himself from the killing and infliction of great bodily injury so that the onus fell on James. This attempt to shift blame onto James shows a lack of trustworthiness. (See

17

*People v. Duarte* (2000) 24 Cal.4th 603, 614-615.) Thus the trial court erred in admitting the statements.

The recording transcript shows that Lancaster described telling his fellow gang members that "Boolaid" was out. Lancaster said he "was all ready" and "he was gonna do it" but the homies already wanted Little E-Mack to do it. Someone wanted a Lady Menlo to drive, but Lancaster said, "[H]ell, no . . . get in the [car]." They "go over there on Lanes do our stuff." Later, he tells Smith that Kool Aid from Hoover was sitting in the back seat behind the passenger. His mama and his sister were in the passenger seat, and he was about to jump out. Lancaster was telling Little E, "Give me the burner, give me the burner" repeatedly. James replied, "[N]aw. . . I got it this mine this mine." Lancaster pulled up right beside her when she pulled over and "Blood lit the bar up." All one heard was "screaming and shit." Lancaster described that they "don't even get Blood. Killed Blood's mama she got hit in the neck . . . and Blood's two sisters get hit."

We disagree with James's assertions. The statements were trustworthy declarations against interest and were therefore admissible under Evidence Code section 1230. The fact that the conversation was surreptitiously recorded is of no consequence. In *People v. Arauz* (2012) 210 Cal.App.4th 1394 (*Arauz*), for example, the defendants, Arauz and Kline, complained that the trial court erred in admitting the jailhouse statements of an accomplice, Jose Velasquez, to an informant. (*Id*. at p. 1397.) Velasquez was placed in a cell next to the informant, and their conversation was secretly recorded. (*Id*. at p. 1399.) The informant said he was associated with the Mexican Mafia. He told Velasquez that Velasquez had been targeted by the Mexican Mafia because he and his associates had committed a drive-by shooting in violation of the Mexican Mafia's rules. The informant said he would "run court" on Velazquez and report to other Mexican Mafia associates. (*Ibid*.)

Velasquez told the informant that he drove Arauz and Kline to the scene of the shooting and described the guns they had with them. He said that the two men got out of the car and shot two "'homies'" from another gang. (*Arauz*, *supra*, 210 Cal.App.4th at p. 1399.) With respect to the issue of "penal interest," the *Arauz* court attached no

significance to the fact that Velasquez had been surreptitiously recorded. The court noted only that, because Velasquez had no belief he was being recorded, his statements were not testimonial for confrontation clause purposes. (*Id*. at p. 1402.) In addition, the court held that, despite the fact that Velasquez thought he had been "greenlighted" and had named the other two gang members as the shooters, thereby shifting the blame, the statement was trustworthy. (*Id*. at p. 1401.) His statements were """"so far contrary to [Velasquez's] interests 'that a reasonable man in his position would not have [said it] unless he believed it to be true.""" (*Ibid*.) Velasquez implicated himself, and his statements were in no way exculpatory. The specificity of his statements also added to their trustworthiness. The statements were thus specifically disserving and admissible as a declaration against penal interest. (*Ibid*.) The circumstances in which Lancaster made his statements are directly analogous to those of Velaquez. Indeed, the fact that Lancaster believed he could speak freely merely adds to the trustworthiness of his statements. (See *People v. Greenberger*, *supra*, 58 Cal.App.4th at p. 335.)

We further conclude that James cannot rely on the shooting's potential to enhance Lancaster's reputation as a means of negating that Lancaster's statements were statements against his penal interest. In *People v. Arceo* (2011) 195 Cal.App.4th 556, the defendant was a gang member who was charged with two murders and with conspiracy to commit those murders as well as gang allegations. (*Id*. at p. 562.) Arceo objected to a witness's testimony that an accomplice, Sergio, made boastful statements about the murders and described how Arceo shot one of the victims when she resisted. (*Id*. at p. 576.) The court held that, to the extent Sergio's boastful statements admitting his own involvement implicated Arceo, the statements were declarations against interest and admissible under Evidence Code section 1230. (*Arceo*, at p. 576.) The statements subjected Sergio to criminal liability, and statements that genuinely and specifically inculpate the declarant provide particularized guarantees of trustworthiness. (*Ibid*.) Thus, the fact that a declarant believes the criminal acts were worthy of bragging about does not diminish the reality of that declarant's susceptibility to criminal liability.

19

Sergio's admission of his involvement "patently disserve[d] his penal interests." (*Id*. at p. 577.)

Adding to the statements' trustworthiness was the fact that they were not made in a custodial context or in a context that shifted the blame to another. (*Arceo*, *supra*, 195 Cal.App.4th at p. 577.) Although James argues that Lancaster attempted to shift the blame to James by saying that James did the actual shooting while he merely drove the car, Lancaster's role was similar to that of Sergio, who said he handed Arceo the gun to shoot one of the victims. The court deemed this an act that subjected Sergio to criminal liability for the murder. Lancaster admitted wanting to do the shooting and acquiring the gun and driving the car. He could have been under no illusion that he was shifting the blame. He was merely laying out the facts. Lancaster was undoubtedly aware that it was not wise to take credit for acts not performed, as Detective Murillo explained. Finally, the court noted that, as in this case, Sergio's statements were made in the most reliable of circumstances, i.e., in a conversation between friends """"in a noncoercive setting that fosters uninhibited disclosures."""" (*Id*. at p. 577, quoting *People v. Cervantes* (2004) 118 Cal.App.4th 162, 175.)

Lancaster's words show that he took an active role in the crimes and that he and James were "relatively equally to blame." (*People v. Brown* (2003) 31 Cal.4th 518, 537; *People v. Cervantes*, *supra*, 118 Cal.App.4th at p. 175.) "'The question as to such declarations is whether under the circumstances the declarant would have been unlikely to say it had it not been true. To be against penal interest under the rule, the statement need not be made to persons who are likely to use it against the declarant in court proceedings. Declarations against penal interest are received notwithstanding that they were spoken in confidence in the expectation they would not be repeated to the authorities. [Citations.] Indeed, that makes such declarations more trustworthy.' [Citation.]" (*People v. Valdez* (2012) 55 Cal. 4th 82, 144.)

We have no doubt that, under the circumstances, Lancaster's statements to Kerry met the requirements of declarations against interest and were trustworthy. We also reject James's due process argument. Adherence to the rules of evidence, including

20

Evidence Code section 1230, does not ordinarily violate due process. (*People v. Lawley* (2002) 27 Cal.4th 102, 154-155; *People v. Hawthorne* (1992) 4 Cal.4th 43, 58.)

## II. Reopening of Jury Selection (Lancaster and James)

### A. Defendants' Arguments

Lancaster argues that, once a jury has been sworn, a trial court lacks the authority to allow the use of peremptory challenges to excuse a sworn juror. In this case, the trial court erred in reopening jury selection and seating another juror. Lancaster and James both contend the trial court's failure to obtain their express waivers of this procedure violated the fundamental right to trial by the sworn jury and created a structural defect requiring reversal of the judgment of conviction. If this court finds waiver, their respective counsel were ineffective.

### B. Proceedings Below

On April 25, 2012, the prosecutor and the defense accepted the jury and the 12 regular jurors were sworn. Immediately afterward, counsel approached the bench and Mr. Sanabria said, "I could be wrong, but did No. 4 mention something about wanting to talk." The court said, "Yeah, No. 4." Mr. Sanabria said he forgot to mention it and apologized. The prosecutor reminded the court that he had requested the court to delay swearing in the jurors until a further Evidence Code 402 hearing was held, but agreed that the issue with Juror No. 4 needed to be addressed as well. The prosecutor stated, "The court launched into it so quickly, I didn't want to interrupt in front of the panel. And the People and counsel are all willing to stipulate that they be deemed unsworn at this point." Mr. Sanabria and Mr. Klink both stated, "So stipulated." The court stated, "And there is a stipulation that they be deemed unsworn, and I'm going to accept the stipulation, because I think we all agreed that they would not be sworn at this point."

Juror No. 4 told the court that she was a student, and her GPA would be compromised if she missed classes. She had been told it was too late for a refund. The prosecutor stated that, if he had known of her situation, he would have exercised a peremptory challenge on this juror, because he did not want a distracted juror. After a discussion, the trial court allowed the People to exercise a peremptory challenge on Juror

No. 4.  Another juror was selected, and the defense accepted the panel.  The prosecutor also accepted the panel.

The trial court pointed out that only two jurors were left for selection of alternates and asked if there were any objections to either of them.  The prosecutor said he would exercise a peremptory challenge to one of them.  The court then decided to select three alternate jurors from a new group of prospective jurors.  After further voir dire, pursuant to a mutual agreement, the parties stipulated to three alternate jurors.  The court agreed not to swear in the jurors until the pending Evidence Code section 402 hearing was finished.  On the following day, the trial court held the hearing.  After pre-instructing the jury, all of the jurors, both regular and alternate, were sworn.

### C.  Relevant Authority

Under the Trial Jury Selection and Management Act (the Act), a trial court has no discretion to reopen jury selection after the trial jury has been impaneled, even if the alternate jurors have not been sworn.  (Code Civ. Proc., § 190 et seq.; *People v. Cottle* (2006) 39 Cal.4th 246, 249 (*Cottle*).)  The Act added Code of Civil Procedure sections 226 and 231, subdivision (a), the latter of which provides that "'[a] challenge to an individual juror may *only* be made before the jury is sworn.'"  (*Cottle*, at p. 255, quoting Code Civ. Proc., § 226, subd. (a).)  Once the jury was sworn, the trial court could discharge [a juror] only if there existed good cause for his [or her] removal.  (Code Civ. Proc., §§ 233 & 234; Pen. Code, § 1089.)"  (*Cottle*, at p. 255.)  Although a trial court lacks authority to reopen jury selection once the 12 trial jurors are sworn, the court is not without recourse if a juror becomes unable to serve.  "Code of Civil Procedure sections 233 and 234 and Penal Code section 1089 provide for the removal of a juror upon a showing of good cause."  (*Cottle*, at p. 259.)

### D.  Waiver; Any Error Harmless

Under *Cottle*, once the jurors were sworn, the trial court lacked authority to reopen jury selection as to those trial jurors.  (*Cottle*, *supra*, 39 Cal.4th at p. 255.)  *Cottle* named no exceptions to this rule.  *Cottle* reasoned that, if a party were allowed to use peremptory challenges to members of the jury after the jury was sworn, but before the alternates were

22

selected, gamesmanship would be encouraged. (*Id*. at p. 257.) "For example, if a favorable juror was selected as an alternate, a party would then try to challenge a member of the jury so that the alternate could replace the juror. Nothing in the legislative history suggests an intention to create such a scheme." (*Ibid*.) Since reopening jury selection was clearly error, it is necessary for us to decide whether defendants' statutory rights under the Act were waived by defendants.

At the outset, we disagree that defendants had to consent personally to waiving or forfeiting a violation of their statutory, nonconstitutional, rights. "'The right to request a mistrial or to elect to continue with a particular jury is not one of the constitutional rights deemed to be so personal and fundamental that it may only be personally waived by the defendant.'" (*People v. Mata* (2013) 57 Cal.4th 178, 185-186.) We conclude defendants waived any objection because their respective counsel expressly agreed to the procedure followed by the trial court. (*People v. Benavides* (2005) 35 Cal.4th 69, 88; *People v. Ervin* (2000) 22 Cal.4th 48, 73.)

It was Lancaster's counsel himself who reminded the court that they had forgotten about Juror No. 4's request to speak to the court about her service. Immediately upon everyone's realizing that the jury had been prematurely sworn, the court asked if the attorneys wanted to stipulate, and Mr. Sanabria said he was fine with that. The prosecutor, Mr. Sanabria, and Mr. Klink immediately stipulated that the jurors "be deemed unsworn" before the court and the parties learned what Juror No. 4's problem was and before the prosecutor made any mention of the fact that the juror's concern about missing classes made her an undesirable juror in his eyes. When the trial court allowed the prosecutor to exercise a peremptory challenge to Juror No. 4, there was no objection from either defense counsel. When Juror No. 15 was seated in Juror No. 4's place, the prosecutor and both attorneys immediately accepted the jury panel as constituted. The prosecutor and both defense counsel then selected the alternate jurors by mutual agreement. We find no opportunity in these occurrences for the prosecutor to practice gamesmanship, which is one of the principal dangers that the Act sought to guard against. The prosecutor did not thereafter exercise another peremptory challenge on any of the

23

jurors. Although "the parties are not free to waive, and the court is not free to forego, compliance with the statutory procedures which are designed to further the policy of random jury selection, equally important policies mandate that criminal convictions not be overturned on the basis of irregularities in jury selection to which the defendant did not object or in which he has acquiesced." (*People v. Visciotti* (1992) 2 Cal.4th 1, 38.) It is unfair to the trial judge and to the prosecution to allow defendant to take advantage on appeal of an error that could have been corrected easily at trial. (*People v. Saunders* (1993) 5 Cal.4th 580, 590.)

Even though the trial court, pursuant to *Cottle*, should not have reopened voir dire after the jury was sworn, defendants must show prejudice in order for their convictions to be reversed. (Cal. Const., art. VI, § 13; see also *People v. Ervin*, *supra*, 22 Cal.4th at p. 73.) Defendants have made no showing that a more favorable result for them was reasonably probable. (*Cottle*, *supra*, 39 Cal.4th at pp. 255, 258 [error constitutes a statutory violation rather than a denial of a constitutional right]; *People v. Anzalone* (2013) 56 Cal.4th 545, 555-557 (*Anzalone*) [applicable standard is whether appellants would have obtained a more favorable result in the absence of the error].) Lancaster makes no specific claim of prejudice. James claims that he suffered prejudice because reopening voir dire allowed the prosecutor to place on the panel a juror whom he thought was more favorable than Juror No. 4. As stated, the record reveals no specific advantage was accorded the prosecutor by the mutually agreed-upon arrangement.

Both defendants argue that if this court finds they forfeited their objections to the unswearing of the jury and reopening of voir dire, their respective attorneys rendered ineffective assistance. In order to show ineffective assistance of counsel, defendants must demonstrate not only that counsel's performance was deficient, but that "the deficient performance prejudiced the defense." (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) The defense is prejudiced whenever "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." (*Id.* at p. 695; *People v. Young* (2007) 156 Cal.App.4th 1165, 1172.) "A claim of ineffective assistance will not be accepted on direct appeal unless the appellate record

24

makes clear that the challenged act or omission was a mistake beyond the range of reasonable competence." (*People v. Montiel* (1993) 5 Cal.4th 877, 911.)

We believe defendants have failed to make the necessary showing of prejudice. It was Mr. Sanabria, Lancaster's counsel, who brought Juror No. 4 to the court's attention. Although it is true that the prosecutor exercised a peremptory challenge to that juror, there is no indication in the record that either of the defense attorneys wanted to retain Juror No. 4. They stipulated to unswearing the jurors before Juror No. 4 discussed her problems. The failure to object to the court's solicitation of a stipulation may have been a tactical choice made by both defense attorneys, as was allowing Juror No. 4 to be removed by the prosecutor's peremptory challenge. A juror worried and distracted by events in his or her personal life is a disadvantage to both sides of the case.

Thus, there is not sufficient prejudice to find ineffective assistance of counsel and there is no reasonable probability that, absent the reopening of voir dire, a more favorable verdict would have resulted.

## III. Taking of the Verdict  (Lancaster and James)

### A. Defendants' Arguments

Lancaster and James contend that, because of the absence of one juror at the rendering of the verdict, they were denied their state constitutional rights to a unanimous verdict on all counts of conviction. They argue that their convictions must therefore be reversed.

### B. Proceedings Below

On the day the jury reached its verdict, the trial judge, Judge Lew, was absent. Judge Bacigalupo was assigned to handle the matter. It was revealed that the jury had reached a verdict the preceding day and had lodged those verdicts with the court clerk or bailiff. Judge Bacigalupo stated that there had been an in-chambers conference regarding Juror No. 6, who had suffered a heart attack the night before and was hospitalized. The juror's wife had conveyed the information to the court. At the court's request, Mr. Sanabria stated for the record that one suggestion was that, if there was a guilty verdict,

25

they poll the 11 jurors who were present and communicate with Juror No. 6 via telephone at a later point or in person if he was healthy enough.

Judge Bacigalupo believed it best to contact Juror No. 6 by telephone that day. He had suggested this procedure to all parties off the record and everyone agreed that it would be a good idea. The court clerk had called Juror No. 6's wife, who stated that Juror No. 6 was in the ICU unit where there was no telephone. She was on her way to see him and agreed to give her cell phone to her husband so that he could converse with the court.

The court stated that it was important that Juror No. 6 have the mental capacity to speak to them and that there would "be some obvious questions about his ability to fully understand what he did yesterday if in fact the verdict was reached yesterday and he voted on it." The court noted that it would be necessary to find out if the juror was able to speak to them and if he was of sound mind. If so, he could be polled telephonically.

Shortly thereafter, the court received a three-page fax from the hospital. Page 2 consisted of a letter stating: "To Whom It May Concern. The purpose of this letter is to verify that the juror, his name is (Juror No. 3508), and his date of birth . . . was admitted to Presbyterian Intercommunity Hospital on May 18, 2012, at 2:00 a.m. This hospitalization was unexpected. His duration is unknown. Thank you for your understanding regarding his jury duty absence." Page 3 was a note stating, "(Juror No. 3508) was taken by ambulance on May 18th at 2:00 a.m. and is hospitalized at this time, and henceforth unable to report to court."

After reading these communications, the court stated that Juror No. 6 was clearly a conscious person. The court suggested everyone wait to take the verdict until Juror No. 6's wife arrived at the hospital and they could determine his medical condition, his ability to verbalize and think, and his ability to tell them what his verdict was. They could then poll the remaining 11 jurors. The court stated, "I would rather get him first before dealing with the 11." The parties agreed to this procedure.

Mr. Klink suggested asking the attending physician whether the juror had been given pain medication. The court agreed that this was also a "prudent course of action."

The prosecutor pointed out that medical personnel would probably not release any information over the telephone. The court concluded that the juror could convey to them "how he's feeling and how he's thinking," and the court and the parties could "get a sense from the patient."

When the jurors were brought into the courtroom, Judge Bacigalupo informed them that Judge Lew was unavailable and that Juror No. 6 had a "medical emergency yesterday or last night." The court said, "We want him to participate in this proceeding." The court reviewed the verdict forms and noted that one of them was ambiguous "because it [was] filled out as to both. And so one is signed, one is not, but they're both filled out. So I don't know what you mean by that." The court asked the jury to retire to the jury room and determine which form reflected their verdict. The court told the jury, "When you come back, we'll get No. 6 on the telephone. He's there ready to speak to us telephonically, and we'll continue accordingly." The jurors returned to the jury room for approximately five minutes.

When the jurors returned to the courtroom, the court announced, "The panel is back in the courtroom. The alternates are present. The defendants are present. All counsel are present. And Juror No. 6 is on the speaker phone; is that correct?" Juror No. 6 replied, "Yes, I am, Juror No. 6." The court remarked, "I see the jurors are relieved. They're smiling to hear your voice." The court asked Juror No. 6 if he was able to "intelligently understand" the proceedings and whether he had the "mental faculties to understand what we are doing at this moment." Juror No. 6 replied, "I do, yes, I do." The court asked the juror, "And are you feeling any—that your head is not clear, that you cannot think, that you cannot understand what I'm saying or what we are doing?" Juror No. 6 replied, "No, I absolutely understand." The court then asked, "And likewise, yesterday when the verdicts were reached, and you—and they were all finalized and submitted to the foreperson, and then they got sealed, did you understand what you were doing, and you understood what had transpired, and you had your full mental capacity to do that? Juror No. 6 stated, "Yes, I did. And I absolutely understood, yes."

27

The court asked the parties if they had any additional questions for Juror No. 6, and the parties said they did not.

The court stated that it had reviewed the verdict forms, and they were signed and dated and filled out correctly. The court handed them to the clerk, who read the verdicts. Upon completing the reading, the clerk asked, "Is this your verdict, so say you one, so say you all?" The jurors answered collectively in the affirmative, and Juror No. 6 stated, "I do." The court then asked the clerk to poll the jury beginning with Juror No. 6. When asked if this was his verdict as to each count as to each defendant, Juror No. 6 replied, "It is."

### C. Relevant Authority

Section 1147 provides: "When the jury have agreed upon their verdict, they must be conducted into court by the officer having them in charge. Their names must then be called, and if all do not appear, the rest must be discharged without giving a verdict. In that case the action may be again tried."

Section 1149 provides: "When the jury appear they must be asked by the Court, or Clerk, whether they have agreed upon their verdict, and if the foreman answers in the affirmative, they must, on being required, declare the same."

Section 1163 provides: "When a verdict is rendered, and before it is recorded, the jury may be polled, at the request of either party, in which case they must be severally asked whether it is their verdict, and if any one answer in the negative, the jury must be sent out for further deliberation."

Section 1164 provides: "(a) When the verdict given is receivable by the court, the clerk shall record it in full upon the minutes, and if requested by any party shall read it to the jury, and inquire of them whether it is their verdict. If any juror disagrees, the fact shall be entered upon the minutes and the jury again sent out; but if no disagreement is expressed, the verdict is complete, and the jury shall, subject to subdivision (b), be discharged from the case. [¶] (b) No jury shall be discharged until the court has verified on the record that the jury has either reached a verdict or has formally declared its inability to reach a verdict on all issues before it, including, but not limited to, the degree

28

of the crime or crimes charged, and the truth of any alleged prior conviction whether in the same proceeding or in a bifurcated proceeding."

Sections 1163 and 1164, when read together, "describe a culminating formal procedure for verifying the unanimity of the jury in open court, and thus they define the moment of transition for when a juror may and may not withdraw his or her affirmation of the verdict." (*People v. Bento* (1998) 65 Cal.App.4th 179, 191.)

The jurors' oral declaration is the true verdict regardless of the verdict forms. (*People v. Traugott* (2010) 184 Cal.App.4th 492, 500 ["it is 'the oral declaration of the jurors, not the submission of the written verdict forms [that] constitutes the *return* of the verdict,'" quoting *People v. Green* (1995) 31 Cal.App.4th 1001, 1009]; *People v. Mestas* (1967) 253 Cal.App.2d 780, 786.) Jury acknowledgement of the verdict in open court is essential to the validity of the verdict. (*People v. Thornton* (1984) 155 Cal.App.3d 845, 858.) If the jury merely returns a written verdict, but fails to unanimously endorse the verdict in open court, the verdict cannot normally be sustained based solely on the written form. (*Ibid*.; see *People v. Green*, at p. 1009; *People v. Mestas*, at p. 786.)

### D.  Waiver; Any Error Harmless

As noted in *Anzalone*, a party must object to an incomplete polling to preserve the issue for appeal. (*Anzalone*, *supra*, 56 Cal.4th at p. 550, citing *Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 262-270.) "'[T]he basis for the requirement of an objection to asserted imperfections in the polling of a jury concerning its verdict is no different from the basis for requiring objections to other equally important procedural matters at trial . . . . The requirement of an objection is premised upon the idea that a party should not sit on his or her hands, but instead must speak up and provide the court with an opportunity to address the alleged error at a time when it might be fixed.'" (*Anzalone*, at p. 550.) *Anzalone* also held that the failure to comply with section 1149 does not constitute structural error. (*Id*. at p. 557.) In the absence of structural error, the *Watson* standard[10] for assessing prejudice is controlling. (*Anzalone*, at p. 555.)

---

**10**    *People v. Watson* (1956) 46 Cal.2d 818.

In the instant case, counsel for both defendants not only did not object, they fully acquiesced and announced their satisfaction in the method devised by Judge Bacigalupo for including Juror No. 6 in the polling. Therefore, both defendants have forfeited the right to raise the issue on appeal.

Even if this court were to reach the merits of the issue, however, we would find any error harmless. "[S]ection 1149 also requires that when the jury returns after reaching a verdict, the court or clerk must ask 'whether they have agreed upon their verdict, and if the foreman answers in the affirmative, they must, on being required, declare the same.'" (*Anzalone*, *supra*, 56 Cal.4th at p. 551.) The court in *Anzalone* explained that a foreman's oral declaration is sufficient acknowledgement of the verdict. (*Ibid*.) The court asked the foreman whether the jury had reached a verdict, to which the foreman clearly answered in the affirmative. It is only in the individual polling that an irregularity occurred.

Although a complete failure to orally acknowledge a written verdict in open court would normally invalidate the verdict (*People v. Thornton*, *supra*, 155 Cal.App.3d at pp. 856-860), individual polling errors do not require reversal in the absence of a showing of prejudice. (*People v. Masajo* (1996) 41 Cal.App.4th 1335, 1339-1340.) Even on a cold record, it is clear that Juror No. 6 was alert and very much aware of his role as a juror. He demonstrated no equivocation when he was asked to affirm the verdict. Although there was no formal identification of his name on the record, he stated that he was Juror No. 6. The hospital had confirmed the juror's name and birth date in the letter it sent to the court. The juror's wife had communicated with the court, and it was her cell phone that was used to telephone the court. The record indicates that the other jurors recognized his voice.

As for the initial discrepancy in the verdict forms noted by Judge Bacigalupo, it appeared to be a clerical mistake in that the jury had filled out a verdict but had signed another verdict form. The foreman corrected the discrepancy by scratching out his signature on the incorrect form. Thus, there was no difference in the verdicts reached the night before and the verdicts read out in the presence of the jurors. Accordingly, in view

30

of Juror No. 6's strong affirmation that the verdicts read in court were the verdicts he and the other jurors had reached during deliberations, defendants have failed to establish that they suffered prejudice by his telephonic appearance.

With respect to defendants' allusions to a violation of their due process rights, "not every violation of the state and federal right to a jury trial is a structural defect requiring reversal without regard to whether the defendant suffered actual prejudice." (*People v. Mil* (2012) 53 Cal.4th 400, 411.) Accordingly, we conclude that in this case, noncompliance with section 1149 was procedural error, subject to harmless error review. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.) And for the reasons set out previously, we believe defendants suffered no miscarriage of justice as a result of the error.

## IV.  Error in Abstract of Judgment (James)

James points out that the trial court imposed a sentence of 236 years to life, but the abstract of judgment shows a sentence of 253 years to life. James requests this court to correct the abstract of judgment.

The record of the sentencing hearing shows that the court sentenced James to 180 years to life plus 56 years of a determinate sentence. The total is 236 years to life. On the first page of the abstract of judgment pertaining to James's determinate sentence, item 8 shows a total time, excluding any county jail term, of 236 years to life. On the following page, however, under item 11, entitled "Other orders" a line states "total term is 253 to life." When the abstract of judgment does not reflect the sentence imposed in the oral pronouncement of judgment, the reviewing court has the power to correct the error. (*People v. Jones* (2012) 54 Cal.4th 1, 89.) The abstract must be amended to correct the error.

31

## DISPOSITION

The judgments are affirmed. The superior court is directed to correct the abstract of judgment pertaining to defendant James to conform to the correct total prison sentence in all sections of the abstract and to forward a copy of the amended abstract to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:


CHAVEZ, J.


FERNS, J.*

_____

*        Judge of the Los Angeles Superior Court, assigned by the Chief Justice
pursuant to article VI, section 6 of the California Constitution.